John P. Aldrich, Esq.
Nevada State Bar No.: 6877
**ALDRICH LAW FIRM, LTD**
1601 S. Rainbow Blvd., Suite 160
Las Vegas, Nevada 89146
(702) 853-5490

Kip B. Shuman, Esq.
Rusty E. Glenn, Esq.
**THE SHUMAN LAW FIRM**
885 Arapahoe Avenue
Boulder, CO 80302
(303) 861-3003
(303) 484-4886 (fax)

*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE RINO INTERNATIONAL CORPORATION DERIVATIVE LITIGATION | ) ) ) ) ) ) ) ) ) |
| This Document Relates To: | |
| ALL ACTIONS | |

Lead Case No. 2:10-cv-02209-RLH-GWF
(Consolidated with 2:10-cv-02244-KJD-DWF)

### VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiffs Andrew Nguyen ("Nguyen") and Robert Binnewies ("Binnewies") (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant RINO International Corporation ("RINO" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties, abuses of control, gross mismanagement, waste of corporate assets and unjust enrichment from February 2009 to the

1

present (the "Relevant Period").

## NATURE OF THE ACTION

2.     In recent years, hundreds of "mid-market" Chinese entities have obtained U.S. securities market listings through a back-door maneuver known as a "reverse takeover" in which an active Chinese business merges into a dormant American shell corporation that is registered for public trading.  One of the problems with this maneuvering is that their financial filings with the U.S. Securities and Exchange Commission (the "SEC") often diverge from those submitted to China's State Administration for Industry and Commerce (the "SAIC") by material  amounts.  In other words, some of these Chinese entities have one set of books for America and one for China.

3.     These reverse takeover companies often fall between the cracks of U.S. market regulations.  The rush of mid-market Chinese companies seeking back-door entry to the U.S. capital markets is becoming a systemic problem that threatens the integrity of the U.S. markets. Incredible as it may sound, the SEC has been and is simply outmanned because of this unprecedented wave of reverse takeover companies.

4.      A significant number of these companies have chosen to incorporate in the U.S. as Nevada corporations.  Indeed, *The Las Vegas Sun* (not exactly a bastion of anti-Nevada sentiment), published a telling article on April 29, 2007 entitled "Nevada A Scam Haven", a copy of which is attached to this complaint as Exhibit A (the "Scam Article").  As stated in the Scam Article, "***[i]f you prefer to operate in the shadows, Nevada is the place***."[1]

5.     RINO appears to be a   prime  example  of  this  troubling  "reverse

---

[1] The Scam Article highlights a series of fraudulent operations which were incorporated in Nevada to avoid close regulatory scrutiny, notably including the historical use of Nevada as the port of entry for fraudulent foreign operations to enter the U.S.  *See* Exhibit A at 6-7.

takeover/Nevada incorporation" phenomena.  According to its U.S. public filings with the SEC ("SEC Filings"), RINO's sole business activities are acting as a holding company for its direct and indirect subsidiaries, which consist of the "designing, manufacturing, installing and servicing wastewater treatment and flue gas desulphurization ["FGD"] equipment principally for use in China's iron and steel industry, and anti-oxidation products and equipment designed for use in the manufacture of hot rolled steel plate products."  Defendants also have claimed that RINO is "the leading provider of clean technologies for China's iron and steel industry."[2]  Notably, upon information and belief at the time this Action was filed, RINO was a controlled Company with defendants Zou Dejun ("Zou"), the Company's Chief Executive Officer ("CEO"), and his wife, defendant Qiu Jianping ("Qiu") the Chair of the Board, owning a majority of its outstanding common stock.

6.      The tax filings defendants submitted to the SAIC (the "SAIC Filings") contain *materially lower revenues compared with the revenues RINO reported in the SEC Filings*[3], for the same reporting time periods.  Indeed, substantial disparities between the SAIC Filings and the SEC Filings demonstrate that defendants issued a series of materially false and misleading statements and omitted material facts that rendered their affirmative statements misleading related to the Company's U.S. financial performance, business prospects, and financial condition.

_____

[2] This statement has been specifically criticized by the research firm Muddy Waters, LLC ("Muddy Waters") as false. As detailed herein, Muddy Waters has reported that when it contacted various large, Chinese iron and steel mills, many stated they had never even heard of RINO -- an unexpected result for the so-called "leading provider of clean technologies for China's iron and steel industry."

[3] Collectively, the SEC Filings and SAIC Filings shall be referred to herein as the "Public Filings."

7.     In fact, RINO's SAIC Filings indicate that the Company is **materially smaller** than its SEC Filings would indicate, and has actually generated only a small fraction of its U.S.-reported revenues.  For fiscal year 2009, RINO's SAIC Filings show consolidated revenues of approximately $11.1 million (converted to U.S. dollars).  For the same period, Defendants reported to the SEC (and to RINO shareholders) consolidated revenues of $192.6 million. Thus, **more than 94% of RINO's U.S. reported revenue "vanished" when RINO reported financial information to China's tax authorities**.  In breach of their fiduciary duties to the Company and its stockholders, defendants engaged in improper financial reporting and accounting practices, and disseminated false and misleading financial statements in violation of SEC regulations and Generally Accepted Accounting Principles ("GAAP").

8.     Specifically, defendants' U.S. reported Consolidated Statements of Income and Other Comprehensive Income, and many (if not all) associated line items, including Revenues, Gross Profit, Net Income, and Earnings Per Share ("EPS") were materially overstated.  As a result, defendants disseminated materially false and misleading financial results to the Company's shareholders for at least fiscal year 2008, fiscal year 2009, and the first and second quarters of fiscal year 2010, and correspondingly filed materially false and misleading financial statements with the SEC.  The submission of this materially false and misleading information to the SEC constitutes a breach of defendants' fiduciary duties.

9.     Defendants' motivation to perpetuate their scheme was simple; actually, they had millions of reasons.  On October 5, 2007, RINO completed a private placement transaction, selling 5,464,357 shares of common stock to investors and raising over $24 million in gross proceeds (the "Securities Purchase Agreement").  In addition to other covenants, the Securities Purchase Agreement provided that 5.58 million shares of RINO common stock beneficially

owned by defendants Zou and Qiu would be subject to escrow in order to secure RINO's obligation under the Securities Purchase Agreement to deliver additional common stock to the private placement investors in the event RINO failed to achieve ***certain financial performance targets for fiscal years 2007 and 2008*** (the "Make Good Escrow Shares").  Thus, in the event RINO did not achieve these financial performance targets during fiscal years 2007 and 2008, it was required to release and distribute the Make Good Escrow Shares to the Private Placement investors, and away from defendants Zou and Qiu.  Accordingly, both Zou and Qiu, who effectively control the Company, were highly, personally, and financially motivated to, and did, engage in a scheme to artificially inflate the Company's financial results.  The Make Good Escrow Shares alone were worth more than ***$85 million*** the day before the Muddy Waters report was published.

10.   But for the diligence of an independent research firm, Muddy Waters (which focuses on mid-market Chinese companies like RINO), there's no telling how long defendants' scheme would have gone undetected.  Specifically, on November 10, 2010, Muddy Waters initiated coverage of RINO with a "strong sell" rating, and issued a scathing research report (the "MW Report") regarding the Company, which illustrated how RINO's SEC Filings were unreliable and materially overstated, and which questioned managements' integrity and their positioning of the Company's business.

11.   For example, the MW Report stated that RINO's "[U.S.] financial statements show substantially inflated revenues, profits, and assets.  Not only has RINO's management failed to make required income transfers to the Company, but they have directed tens of millions of dollars from RINO into [a..] company [wholly owned by defendants Zou and Qiu]."

12.   Additionally, the MW Report stated that "RINO has fabricated [U.S. reported]

FGD customer relationships, and therefore significantly overstated revenue. We spoke with knowledgeable people at nine of RINO's purported customers. ***Five of the nine deny having purchased FGD systems from RINO***.[4] ***It is likely that RINO fabricated a sixth customer relationship (Bao Steel) from this group as well***. Only three customers from the group confirm having purchased FGD systems from RINO....Because FGD historically represents approximately 60%-75% of RINO's reported revenue, ***these fabrications show that RINO is significantly overstating its revenue***."

13.   Moreover, the MW Report indicated that defendant Zou and his wife, defendant Qiu, ***used Company funds obtained through an illicit and improper interest-free "loan" approved or permitted by the Board to purchase a $3.5 million luxury home in Orange County, California***. Of course, this benefit was not shared with the Company's shareholders, that is unless Zou and Qiu plan to allow RINO stockholders to "sleepover" at the beach:

---

[4] Emphasis is supplied throughout unless otherwise noted.





14.      Section 402 of the Sarbanes-Oxley Act of 2002 ("SOX") expressly makes it

---

[5] This property is currently listed for sale for approximately $4 million.  The listing can be viewed at: http://www.redfin.com/CA/Coto-De-Caza/31232-Via-Colinas-92679/home/5054824.

unlawful for any issuer to make personal loans to executives (which defendants Zou and Qiu most assuredly are), and notably, the Board cannot hide behind waiver or any other defense on this claim.  The $3.5 million "loan" to Zou and Qiu is an *ultra vires* act, incapable of ratification through disclosure, a stockholder vote, or subsequent Board approval.

15.     RINO's common stock closed at $15.52 per share on November 9, 2010, the last trading day before the release of the MW Report.  The following day, November 10, 2010, Muddy Waters published the MW Report and the Company's shares immediately declined by $2.34 per share, or over 15%, to close at $13.18 per share.  In the following days, RINO's shares collapsed an additional $7.11 per share to close at $6.07 per share, or over 53%, before trading in RINO shares was halted by NASDAQ on November 17, 2010.  RINO's shares fell a total of $9.45 per share, or over **60%**, in the six trading days between the publication of the MW Report and NASDAQ's decision to halt trading of RINO as additional news regarding the Company's suspect operations emerged.

16.     On November 19, 2010, defendants caused the Company to disclose that it had received a letter from Frazer Frost, LLP[6] ("Frazer Frost") -- its "independent auditor" -- which stated that RINO's CEO had informed Frazer Frost that "as to the six RINO customer contracts discussed in the recent report of Muddy Waters [], the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable."   This knee-jerk disclosure by defendants and Frazer Frost was based upon a telephone conversation one of Frazer Frost's employees had with defendant Zou. At this point, Frazer Frost had not commenced any investigation nor did it have any basis (other than the relatively worthless

---

[6] According to RINO's 2009 Proxy Statement filed with the SEC on August 27, 2010, Frazer Frost replaced Jimmy C.H. Cheung & Co. as RINO's outside auditor beginning in fiscal year 2009.

assurances of defendant Zou) to determine that only two of the reported contracts were fraudulent and another was "explainable."

17.     Thus, even at this early date, and without the benefit of discovery, significant aspects of the MW Report have essentially been verified as accurate by defendants' own independent accounting auditor.  Frazer Frost also advised the Company ***"to promptly notify any person or entity that is known to be relying upon or is likely to rely upon our audit report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010 should no longer be relied upon, and that revised financial statements and revised auditor's report(s) will be issued upon completion of an investigation."***

18.     Also on November 19, 2010, defendants disclosed that the Board had "concluded that previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009...and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on."   Thus, instead of refuting the contentions in the MW Report, a mere nine (9) days after it was published the Board announced that the Company's SEC Filings could no longer be relied upon.  Obviously, to the extent that Zou and Qiu (and/or other defendants) were conducting a scheme at RINO, it certainly was not sophisticated or hard to detect.

19.     Additionally, defendants disclosed that RINO's previously issued financial statements ***could no longer be relied upon was based on statements made to the Board by the CEO, who after consultation with RINO's Chief Accountant, "reported to the Board that the Registrant did not enter into two contracts for which it reported revenue during the***

9

***Registrant's 2008 and 2009 fiscal years.''***  In other words, the CEO confessed at least part of the scheme to the Board just nine (9) days after the MW Report was published.

20.     On December 2, 2010, defendants caused the Company to disclose that the SEC was conducting "a formal investigation relating to the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present."[7]  Defendants further announced that NASDAQ had informed RINO that its shares were going to be de-listed, based upon their disclosure that RINO's "previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon'' and their "admission that it had not entered into certain previously disclosed contracts."

21.     Finally, on December 8, 2010, RINO's shares finally resumed trading, after having been halted for three weeks. By the end of that day, the Company's shares had declined an additional $2.92 per share, or over 48%, to close on December 8, 2010 at $3.15 per share.

22.     As a result of this chain of shocking events, RINO's shares declined from a closing price of $15.52 on November 9, 2010 (the day before the MW Report was released) to a closing price of $3.15 per share on December 8, 2010 (the day they resumed trading). Cumulatively, RINO's shares declined $12.97 per share, or almost ***80%,*** in just one month. The price of the Company's stock still has not recovered and currently trades for under $2 per share.

23.     The true facts, which defendants failed to disclose during the Relevant Period,

---

[7] The Foreign Corrupt Practices Act (the "FCPA") is a federal statute which, among other things, concerns bribery of foreign officials.  The anti-bribery provisions of the FCPA prohibit the use of interstate commerce corruptly, in furtherance of an offer or payment of anything of value to a foreign official, foreign political party, or candidate for political office, for the purpose of influencing any act of that foreign official in violation of the duty of that official, or to secure any improper advantage in order to obtain or retain business.

were as follows:

    a.   RINO's financial results reported to the SEC and U.S. investors in the SEC Filings was approximately $180 million less than the amount reported to the Chinese SAIC in the SAIC Filings for fiscal 2009;

    b.   RINO's reported U.S. revenues in the SEC Filings were grossly inflated by including revenues RINO had in fact never earned from fictitious "customers"; and

    c.   Defendants illegally caused $3.5 million of Company funds to be "loaned," interest-free and without any written agreement, to two senior Company officials.

24.    As a result of defendants' breaches of fiduciary duty and other misconduct, RINO has sustained damages, including, but not limited to, costs and expenses incurred in connection with the Company's internal investigation and ongoing SEC investigation, and costs and expenses incurred in connection with the Company's restatement of its historical financial statements.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the Plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to

render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) RINO is incorporated under the laws of the State of Nevada; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to RINO occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

28.     Plaintiff Nguyen is a current shareholder of RINO and has continuously held RINO stock at all relevant times to the acts complained of herein.  Nguyen is a citizen of North Carolina.

29.     Plaintiff Binnewies is a current shareholder of RINO and has continuously held RINO stock at all relevant times to the acts complained of herein.  Biennewies is a citizen of Oregon.

30.     Nominal defendant RINO is a Nevada corporation with its principal place of business located at 11 Youquan Road, Zhanqian Street, Jinzhou District, Dalian, People's Republic of China ("PRC") 116100.  According to its public filings, RINO, through its subsidiaries, operates as an environmental protection and remediation company in the PRC.

31.     Defendant Zou is a co-founder of the Company and has served as the Company's CEO since at least October 2007.  In addition, defendant Zou has served as a director of the Company since at least October 2007.  Further, defendant Zou used a $3.5

million "loan" of Company funds to purchase a luxury home in Orange County, California. Defendant Zou is the Company's majority stockholder, and he owned approximately 56% of RINO's outstanding common shares as of August 2010.  Moreover, as a condition of a private placement, which was completed on October 5, 2007, defendant Zou and his wife, defendant Qiu, agreed to place in escrow for the benefit of the private placement investors 5.58 million shares of RINO common stock, some or all of which were distributable to investors in the event the Company failed to attain specified financial performance milestones.  During the fiscal year ended December 31, 2009, 3.906 million shares were released to the Innomind Trust (wholly owned by defendants Zou and Qiu), because the Company achieved the earnings threshold for 2008 required under the securities purchase agreement related to such private placement transaction. According to RINO's Proxy Statement filed on August 27, 2010, all 5.58 million shares in escrow have been released to the Innomind Trust.  Upon information and belief, defendant Zou is a citizen of the PRC.

32.    Defendant Qiu is a co-founder of the Company and has served as Chair of the Board since at least March 2008.  In addition, defendant Qiu is the wife of defendant Zou. Upon information and belief, defendant Qiu owns approximately 6% of the Company's outstanding common shares.  Further, defendant Qiu used a $3.5 million loan of Company funds to purchase a luxury home in Orange County, California.  Upon information and belief, defendant Qiu is a citizen of the PRC.

33.    Defendant Ben Wang ("Wang") has served as the Company's Chief Financial Officer ("CFO") since April 2010.  Upon information and belief, defendant Wang is a citizen of the PRC.

34.    Defendant Jenny Liu ("Liu") served as CFO of the Company from June 2009

until her "resignation" in April 2010.  Upon information and belief, defendant Liu is a citizen of the PRC.

35.     Defendant Yu Li ("Yu") has served as the Company's Finance Manager since 2005.  Upon information and belief, defendant Yu is a citizen of the PRC.

36.     Defendant Kennith C. Johnson ("Johnson") has served as a director of the Company since 2008.  In addition, upon information and belief, defendant Johnson served as a member of the Board's Audit Committee (the "Audit Committee") throughout the Relevant Period.  According to RINO's August 27, 2010 Proxy Statement, defendant Johnson is RINO's designated financial expert.   Upon information and belief, defendant Johnson is a citizen of New York.

37.     Defendant Quan Xie ("Quan") has served as a director of the Company since 2008.  In addition, defendant Quan has served as a member of the Audit Committee throughout the Relevant Period.  Upon information and belief, defendant Quan is a citizen of the PRC.

38.     Defendant Li Zejin ("Li") has served as a director of the Company since at least August 2010.   Upon information and belief, defendant Li served as a member of the Audit Committee during the Relevant Period, and is a citizen of the PRC.

39.     Defendant Zhang Weiguo ("Zhang") served as a director of the Company from March 2008 until October 2010.  Additionally, defendant Zhang previously served as a member of the Audit Committee.

40.     Collectively, defendants Zou, Qiu, Liu, Wang, Yu, Johnson, Quan, Zhang, and Li shall be referred to herein as "Defendants."

41.     Collectively, defendants Johnson and Quan shall be referred to as the "Audit Committee Defendants."

## **DEFENDANTS' DUTIES**

42.     By reason of their positions as officers, directors, and/or fiduciaries of RINO and because of their ability to control the business and corporate affairs of RINO, Defendants owed RINO and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage RINO in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of RINO and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to RINO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

43.     Defendants, because of their positions of control and authority as directors and/or officers of RINO, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with RINO, each of the Defendants had knowledge of material non-public information regarding the Company.

44.     To discharge their duties, the officers and directors of RINO were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of RINO were required to, among other things:

> a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business

b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

45.     Pursuant to the Company's Code of Ethics (the "Code of Ethics"), "[a]ny employee or director having information concerning any prohibited or unlawful act shall promptly report such matter to the Chief Financial Officer."

46.     Pursuant to the Audit Committee's Charter, the directors on   the Audit Committee are required, *inter alia*, to:

a.  Review audit results and annual and interim financial statements;

b.  Review and resolve any disagreements between management and the outside auditors that arise in connection with financial reporting;

c.  Oversee the adequacy of the Company's system of internal accounting controls;

d.  Oversee the Company's compliance with SEC requirements for disclosure of auditor's services and Audit Committee members and activities; and

e.  Oversee the effectiveness of the internal audit function.

47.     Clearly, the Audit Committee Defendants made no true effort to comply with their duties; this inference is vividly illustrated by the relative ease at which the scheme was discovered by an outside party, with no pre-existing relationship with the Company or its

customers. The MW Report was merely a single thread, and when it was pulled, the entire scheme unraveled within the matter of days.  The speed and ease which the scheme was detected reflects that the Audit Committee Defendants did not comply with their fiduciary duties during the Relevant Period.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Suspicious Background – A Corporate Shell is Revitalized and Migrates from Minnesota to Nevada

48.     According to its Public Filings, RINO, through its subsidiaries, operates as an environmental protection and remediation company in the PRC.  The Company engages in designing, manufacturing, installing, and servicing wastewater treatment and FGD equipment primarily for use in the iron and steel industry and anti-oxidation products and equipment for use in the manufacture of hot rolled steel plate products.  Prior to the Company's announced restatement of its U.S.-reported financial results, Defendants had represented that FGD sales and service historically accounted for approximately 65-70% of RINO's U.S. reported revenues.

49.     In recent years, a wave of Chinese companies has emerged on the international capital markets.  These companies obtain U.S. listings through a back-door maneuver known as a "reverse takeover" ("RTO") and thus avoid the regulatory and market scrutiny associated with initial public offerings, which are public, move slower and are more onerous.  Typically, a Chinese business is acquired by a U.S. dormant shell company that is worthless except for its public listing.  The American board of directors then resigns, and the Chinese board of directors assumes control.  The company changes its name and issues new stock to hedge funds and other investors, raising millions of dollars in fresh capital.

50.     These Chinese RTO companies often fall between the cracks of U.S. market regulation, as the SEC's enforcement staff cannot subpoena evidence of any fraudulent

activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S.  Additionally, many RTO companies admit in prospectuses that they have not received the required approvals under China's financial regulations.  In other words, it's the Wild, Wild, West, and it threatens the integrity of both U.S. capital markets and Nevada corporations.

51.     The Public Company Accounting Oversight Board ("PCAOB"), established under SOX to police auditors, recently warned against lax auditing of U.S.-listed Chinese businesses.  In fact, the PCAOB plans to request that Congress lift restrictions on the disclosure of its disciplinary proceedings against accountants.  China is one of several nations that will not allow the PCAOB to inspect the local auditors used by U.S.-listed companies.

52.     A prime example of these Chinese RTO companies is RINO.  According to RINO's Annual Report on Form 10-K, filed with the SEC on March 31, 2009, the Company presently known as RINO was originally incorporated in Minnesota in 1984 as Applied Biometrics, Inc. ("Applied"), for the purpose of developing and marketing a cardiac output monitoring system.  In August 2000, Applied's board of directors determined that Applied would be unable to complete the development of its primary product, and thereupon ceased its business operations.  During the latter part of 2000, Applied wound down its operations, eliminated most expenses and negotiated the termination or satisfaction of all of the Company's obligations.  In May 2002, Applied filed a Form 15 with the SEC and ceased acting as a "reporting company" under the Securities Exchange Act of 1934, as amended (the "Exchange Act").  At a special meeting held on August 4, 2005, Applied's shareholders voted to adopt a plan of complete liquidation and dissolution of Applied.  After that shareholder vote, but before Applied's remaining funds were distributed, a private investor contacted Applied with a proposed reorganization plan.  The plan provided that, in exchange for a $100,000 loan from

Glenn A. Little ("Little") (which was subsequently distributed to Applied's shareholders), Little would receive a substantial percentage of Applied's common stock. At a special shareholders' meeting held on February 8, 2006, Little's proposal was approved and the loan was subsequently converted to 10,000,000 shares of the Company's common stock.  As a result, Little became the Company's majority shareholder with (at the time) 64.1% of the issued and outstanding shares.

53.     Further, according to RINO's Annual Report on Form 10-K filed on March 31, 2009, in 2006, Applied changed its state of incorporation from Minnesota to Nevada, and authorized Applied's board of directors to change the Company's name from "Applied Biometrics, Inc." to "such other name as the Board deemed appropriate."  Subsequently, the Company's name was changed to "Jade Mountain Corporation" ("Jade"). Thereafter, in January 2007, Applied Biometrics, Inc. merged with and into its wholly owned subsidiary, Jade, a Nevada corporation.  According to a Form 10-SB filed by Jade and signed by Little on December 27, 2006, Jade was "formed solely for the purpose of the merger in order to change the Company's domicile…to Nevada."

54.     Defendants' choice of incorporating in Nevada was likely driven by the reputation of Nevada as a "scam haven."  Indeed, *The Las Vegas Sun* published the telling Scam Article on April 29, 2007.  *See* Exhibit A.  As stated in the Scam Article, "[i]f you prefer to operate in the shadows, Nevada is the place."  The Scam Article highlights a series of fraudulent operations incorporated in Nevada to avoid close regulatory scrutiny, notably including the historical use of Nevada as the port of entry for fraudulent foreign operations to enter the United States (*see e.g.* Ex. A at 6-7, detailing the historical use of Nevada to incorporate "pump-and-dump" schemes originating in Canada).

19

55.     It was only a matter of time until the wave of "reverse takeover" scams from China landed in Nevada.  Indeed, on December 21, 2010, *TheStreet.com* published an article entitled, "SEC Probes China Stock Fraud Network" (the "Street.com Article", attached as Exhibit B hereto).  As explained in the Street.com Article, a series of companies originating in China (including RINO) have obtained incorporation in the U.S. in order to permit the corporate insiders (*i.e.,* directors and officers) of such operations to misuse the newly incorporated entity for illicit or other improper activities to unjustly enrich themselves at the expense of the companies and their U.S. shareholders.

56.     The Street.com Article highlights several such companies that, like RINO, are also incorporated in Nevada, such as China Energy Savings Technology and China Water & Drinks.  *See* Exhibit B.  The damage to U.S. shareholders from such scam operations was estimated to be in excess of ***$34 billion*** as of December 2010, according to the Street.com Article.[8]

57.     Next, pursuant to a Share Exchange agreement (the "Share Exchange") between Jade and Innomind Group Ltd. ("Innomind"), on October 5, 2007 Jade acquired Innomind, Innomind's wholly owned subsidiary, Dalian Innomind, as well as some of the assets and the business of Dalian Innomind's PRC affiliate, Dalian Rino Environment Engineering Science And Technology Co., Ltd. ("Dalian Rino").  Pursuant to the Share Exchange, Jade issued 17,899,643 shares of common stock (the "Control Shares") to Zhang Ze, the nephew of defendants Zou

---

[8] While Delaware has also seen its share of "reverse takeover" companies originating in China (*see e.g.,* Fuqi International, Bodisen Biotech and Asia Time, discussed in the Street.com Article), Delaware's Court of Chancery is one of the "world's most highly regarded business courts" and as a result, Delaware typically attracts the largest (legitimate) businesses in this country due to the well-developed caselaw in that jurisdiction.  *See e.g.,* Exhibit A at 4-5. Defendants herein followed the path of incorporating in Nevada, a state with admittedly fewer resources to investigate and prosecute fraud.  *See e.g.,* Exhibit A at 8.

and Qiu and Innomind's sole shareholder, in exchange for 10 shares of capital stock of Innomind (which represented all of the issued and outstanding shares of Innomind) which were owned by Zhang Ze.   At the completion of the Share Exchange, Dalian Innomind assumed the management of the business activities of Dalian Rino, rendering Dalian Rino a controlled affiliate of Dalian Innomind, and Innomind a wholly owned subsidiary of RINO.

58.     Simultaneously with the consummation of the Share Exchange, Zhang Ze transferred and conveyed all of the Control Shares to the "Innomind Trust," a trust established with defendants Zou and Qiu as the sole beneficiaries.  As of December 31, 2008, the Control Shares represented 71.5% of RINO's total outstanding common stock, and according to RINO's 2009 Annual Report, filed with the SEC on March 31, 2010, defendants Zou and Qiu continue to own or control a significant majority (over 65%, or 17.9 million of the 28.6 million shares) of outstanding RINO common stock.

59.     Defendants, admittedly, were highly aware of the potential pitfalls that accompany any "controlled" company, particularly one with this history, where Zou and Qiu were personally and directly motivated to quickly report the best U.S. results possible due to their obligations under the Securities Purchase Agreement.  For example, in the Company's Annual Report filed on March 31, 2009, Defendants stated the following:

> ***Our officers, directors and affiliates control us through their positions and stock ownership and their interests may differ from other stockholders.***
>
> Our officers and directors beneficially own approximately 62.5% of our Common Stock. As a result, they are able to control the outcome of stockholder votes on various matters, including the election of directors and extraordinary corporate transactions, including business combinations. The interests of our directors and officers may differ from other stockholders. "

60.     Also on October 5, 2007, RINO completed the Securities Purchase Agreement, selling 5,464,357 shares of common stock to investors and raising over $24 million in gross proceeds.  In addition to other covenants, the Securities Purchase Agreement provided that 5.58

million shares of RINO common stock beneficially owned by defendants Zou and Qiu, through the Innomind Trust, would be subject to escrow in order to secure RINO's obligation under the Securities Purchase Agreement to deliver additional common stock to the private placement investors in the event RINO failed to achieve *certain financial performance targets for fiscal years 2007 and 2008* (the Make Good Escrow Shares).  Thus, in the event RINO did not achieve these financial performance targets during fiscal years 2007 and 2008, it was required to release and distribute the Make Good Escrow Shares to the Private Placement investors, and away from defendants Zou and Qiu.

61.  Accordingly, both Zou and Qiu were highly, personally, and financially motivated to, and did, engage in a scheme to artificially inflate the Company's financial results. Moreover, based in no small part on Defendants' scheme alleged herein, RINO purportedly "met" these financial performance targets, causing the release of the more than five million Make Good Escrow Shares to the Innomind Trust, and through the Innomind Trust to defendants Zou and Qiu.  These shares represent almost *20%* of RINO's total outstanding common shares, and on November 9, 2010, the day before the MW Report was published and RINO's corresponding share implosion began, the Make Good Escrow Shares alone were worth more than *$85 million!*

62.  Effective May 9, 2008, Jade changed the name of the Company to "RINO International Corporation."  Presently, RINO's sole business activities are acting as the holding company of its direct and indirect subsidiaries.

63.  Not long after RINO went public, at least from the outside looking in, RINO appeared to be a typical "growth story," which Wall Street and the U.S. securities markets favor when it comes to predicting future stock prices.  Companies perceived as growth companies

often see their stock prices trade at "premiums" based on their then-current operating conditions.  In essence, the market is making a collective wager that growth companies will outperform other companies whose businesses are believed to be more "mature," and thus their revenues and earnings grow at a slower rate.

64.    To be considered a true growth story, a company would usually need to demonstrate annual revenue growth of approximately 30% per year (or more).  Indeed, it is the expectation of unimpeded future growth that causes the market to "bid" a growth company's share price up to high valuations.  Stated simply, a growth company's shares are valued higher than their intrinsic worth, due to the expectation that in the future the company's intrinsic value will exceed its current valuation.

65.    This was especially true with respect to PRC companies engaged in infrastructure building within the PRC.  Many, many U.S. investors had a feverish desire to cash-in on the world's best growth story -- the next worldwide economic behemoth, China.  Thus, the stock prices of Chinese companies building infrastructure in the PRC were often bid-up, and received very healthy, growth-style valuations.

66.    In RINO's case, in each year since the reverse merger and going public, Defendants reported dramatically increasing revenues due to Chinese-government-mandated pollution control standards.[9]  Accordingly, the Company's reported U.S. revenues followed suit, increasing from $63.4 million in fiscal 2007 to $139 million in fiscal 2008, and then increasing

---

[9]  For example, in RINO's September 21, 2010 Investor Presentation (the "Investor Presentation"), Defendants claimed that of the approximately 400 Chinese sinter plants in the iron and steel industry, only 50 had installed FGD systems.  The Investor Presentation also claims that coal-fired sinter plants "are required to install desulphurization facilities or will be imposed with monthly penalties" and "[d]emand for industrial environmental protection services has been rapidly increasing due to government support and increasing industrial pollution."

again to $192.6 million in fiscal 2009 -- from 2007 to 2009, this represents an increase of more than ***204%***.   Meanwhile, the Company's stock price skyrocketed during this same time frame, rising from just $2.30 per share in September 2007 to a high of $32.35 per share by November 2009.

67.   However, RINO's reported financial results upon which its purported "growth story" was based would ultimately turn out to be, in significant part, untrue.

### The MW Report Uncovers Rampant Wrongdoing, Including the Illegal Secret "Loan" to Zou and Qiu of Company Funds

68.   On November 10, 2010, Muddy Waters published the shocking MW Report regarding RINO's shady business and accounting practices, claiming that the Company had been engaged in improper and illicit activities ranging from vastly inflating revenues, to fabricating customer relationships, and allowing its top members of management (defendants Zou and Qiu) to use corporate assets to buy a luxury home in southern California.   The serious allegations in the MW Report went un-refuted by Defendants -- on the contrary, nine days after its publication they announced a planned restatement based on the substance of the MW Report -- and shook the Company's stockholders to the core, because they related to the fundamental questions as to whether Defendants were operating a legitimate business or not, and to what degree were the Company's reported U.S. results were legitimate.

### A.   Fabricated Customers

69.   Muddy Waters contacted numerous RINO customers in an attempt to confirm that each had contracted with RINO for the purchase of an FGD system.   According to contacts with the listed companies, five of the listed FGD customers denied that RINO had installed an FGD system at their company and Muddy Waters expressed doubt in a sixth.   Logically, the revenues corresponding with these customers would be false as well.   Some customers would

not comment, implying that five of fifteen fabricated "customers" is probably a low estimate.

70.    For example, Zhuhai Yueyufeng Iron & Steel (a state-controlled company) ("Zhuhai Yeuyufeng") confirmed to Muddy Waters that it had one FGD system and that RINO was not the seller.  The corporate website of one of RINO's competitors -- Zhuhai Guangjing Environmental Co. Ltd. -- claims to have designed and developed the Zhuhai Yeuyufeng FGD system.   In addition, a Chinese National Radio ("CNR") article[10] describes the Zhuhai Yeuyufeng FGD system as a "dual-alkali…sodium based…desulfurization tower (cyclone tower)."  This is not the type of FGD technology RINO claims to use.  In RINO's Investor Presentation, available on its website[11] and updated on September 21, 2010, Defendants describe the Company's FGD process as "ammonia-based DXT"—not "dual-alkali sodium based" as the CNR article claims is in operation at Zhuhai Yeuyufeng.  Thus, it is unlikely that Zhuhai Yeuyufeng's FGD system is a RINO system.

71.    In addition, Defendants claimed in the Investor Presentation that the Company installed both an FGD system and a "Wastewater" system at Zhuhai Yeuyufeng (which also could not be confirmed by Muddy Waters).  Thus, not only has the supposed customer denied using RINO products, a competitor is taking credit for that same project and at least one other news source described the Zhuhai Yeuyufeng FGD system as one using different technology from the kind produced by RINO.

72.    These types of inconsistencies were found by Muddy Waters to exist with six of RINO's alleged material customers; *the customers that Defendants themselves identified as*

---

[10] Available: http://www.cnr.cn/zhfw/xwzx/zhxw/200908/t20090811_505427307.html

[11] Available: http://content.stockpr.com/rino/media/954eb55497aa528dcd2832e4571d00ec.pdf

*the Company's material customers in the Company's SEC Filings*.[12]   According to the Investor Presentation, FGD systems are RINO's "biggest revenue contributor" and each installed unit ranges in price from $7-14 million per unit.  Based on a historical average of 60-75% of revenues coming from FGD systems, RINO could theoretically have had fewer than ten FGD customers in fiscal 2009, six FGD customers in fiscal 2008, and just three FGD customers in fiscal 2007.  Thus, the loss of  even a small number of customers would cause a material decrease in RINO's revenues.

73.   The portion of the MW Report detailing these fabricated "customers" of the Company specifically states:

**RINO has Fabricated FGD Customer Relationships and Significantly Overstated Revenue.**

RINO has fabricated FGD customer relationships, and therefore significantly overstated revenue. We spoke with knowledgeable people at nine of RINO's purported customers. Five of the nine deny having purchased FGD systems from RINO. It is likely that RINO fabricated a sixth customer relationship (Bao Steel) from this group as well. Only three customers from the group confirm having purchased FGD systems from RINO. (However, a s discussed in RINO's Gross Margins are Improbable Relative to the Rest of the Industry — Particularly Because RINO is a Minor Player, has a damaged reputation, and Uses an Inferior Technology. RINO's Characterizations of its Position Within the Industry are Misleading, there are issues with one to two of these systems). Because FGD historically represents approximately 60% - 75% of RINO's reported revenue, these fabrications show that RINO is significantly overstating its revenue.

The purported FGD customers we found that have not actually purchased RINO FGD systems are the Yueyufeng Steel Group ("Yueyufeng"), Yuhua Steel Co. Ltd ("Yuhua"), the Lai Steel Group ("Lai"), Chongqing Iron & Steel ("Chongqing"), Nanchang Changli Iron & Steel ("Changli"), and most likely Bao Steel ("Bao").

*Yueyufeng relationship is fabricated*

We confirmed that Yueyufeng is not an FGD customer, which means that 2009 revenue is at least $12.7 million lower than reported. A RINO March 2010 investor presentation

---

[12] Muddy Waters determined that, in addition to the Zhuhai Yeuyufeng customer, Yuhua Iron & Steel, Lai Steel Group, Chongqing Iron & Steel, and Nanchangchangli Iron & Steel were also fabricated and/or could not be confirmed by the respective companies.  Lai Steel Group is not listed in RINO's 2009 Form 10-K as a customer, but is found in the aforementioned Investor Presentation as a "Selected Costumer".  All others are listed in RINO's 2009 Form 10-K.

("Investor Presentation") claims that Yueyufeng is a significant FGD customer. However, when we spoke with Yueyufeng, our contact stated that it has only one FGD system, and that RINO was not the vendor. The corporate website of Zhuhai Guangjing Environmental Co. Ltd. claims that it designed the FGD system. According to a local newspaper report, the Yueyufeng system uses a technology (wet, double alkali) that is different from those RINO provides. The China Construction Project Bidding website shows that the contract had an initial value of RMB 26.5 million ($3.9 million), which means that the actual vendors that worked on the project received substantially less than RINO claims to have ($12.7 million).

*Yuhua relationship is fabricated*

We confirmed that Yuhua is not an FGD customer. RINO disclosed in its 2008 10-K (filed March 31, 2009) that it had installed an FGD system at Yuhua. However, our contact reported that Yuhua only has one FGD system, and that RINO was not the vendor. Publicly available information on the project also contradicts RINO 's claim that Yuhua is an FGD customer. According to the local government of Wuan's record of environmental related projects, the expected completion date of the Yuhua FGD system is December 2009. (We believe but were unable to confirm that the project was not completed until this year.) Therefore, at the time RINO falsely claimed to have installed the FGD system, it was close to one year away from completion (by another vendor).

*Lai relationship is fabricated*

We confirmed that Lai is not an FGD customer. The Investor Presentation claims that Lai is an FGD customer. However, Lai has two FGD systems, and no work was contracted or sub-contracted to RINO. Our contact at Lai is familiar with RINO because he heard that the FGD system RINO built for Jinan Iron & Steel was taken off line. He stated, "[RINO's] technology has no advantage beside not producing wastewater."

*Chongqing relationship is fabricated*

We confirmed that Chongqing is not an FGD customer. RINO's 2009 Form 10-K states that RINO has installed an FGD system at Chongqing. However, our contact stated that Chongqing is currently building its first FGD system. The vendors are Shanghai Liyi Environmental Protection Co., two Chongqing subsidiaries, and China Coal International Group. Specifically, RINO is not a vendor. Changli relationship is fabricated We confirmed that Changli is not currently an FGD customer. However, RINO's 2009 Form 10-K states that RINO had installed an FGD system at Changli. Changli is presently soliciting bids for its first FGD system, and RINO is among the companies that have presented proposals.

*Bao relationship is likely fabricated*

We think it is probable that RINO did not work on any FGD projects for Bao or its subsidiaries, despite its claim in the Investor Presentation to have done so. We spoke with a senior Bao executive who was responsible for installing FGD systems on three of Bao's sinters (including at a subsidiary). The executive had never heard of RINO. Moreover, the technical opinion from a Bao engineer that the International Financial Research & Analysis Group provided (in RINO's Gross Margins are Improbable Relative to the Rest of the Industry — Particularly Because RINO is a Minor Player, has a damaged reputation, and Uses an Inferior Technology. RINO's Characterizations of its Position Within the Industry are Misleading,) states that Bao never engaged RINO, nor would Bao consider using RINO's CFB technology.

27

**B.      SAIC Filings Grossly Differ From SEC Filings**

74.      Annually, each of the Chinese RINO-affiliated entities, including Dalian RINO, Innomind and two other subsidiaries/segments (Construction and Design) reported financial information to the SAIC, similar to the manner in which  U.S. public companies provide such information to the SEC.

75.      For fiscal year 2009, Muddy Waters' Chinese investigators, after inspecting RINO's SAIC Filings[13], show consolidated revenues of approximately $11.1 million (converted to U.S. dollars).  Importantly, only Dalian RINO reported any revenues during 2009.  During this same period, Defendants reported to the SEC (and to RINO shareholders) consolidated revenues of $192.6 million -- *a difference of more than $180 million!*[14]  Unlike, for example, net taxable income under GAAP, gross revenue is a "top-line item" that is not the type which would likely be radically different between different accounting systems.

76.      In light of Defendants' admissions that RINO will be forced to restate its previously-reported U.S. results, and Frazer Frost's statements that previously-issued U.S. results should no longer be relied upon, it is reasonable to infer that, among other things, reported U.S. revenues were in fact materially overstated by some amount, and perhaps as much as the MW Report claims.

_____

[13] Filings submitted to the SAIC are not as readily available as SEC filings via the EDGAR database.  China does not have a public, EDGAR-like database where any potential investor may investigate a company's filings.  Only qualified PRC attorneys may make an application to the Chinese government to inspect SAIC filings.

[14] Undoubtedly, differences abound between U.S. accounting rules and Chinese accounting rules. It is unlikely that these differences would provide any justification for the more than $180 million divergence between revenue reported to the SAIC and the SEC.  Revenue, in general terms, can be defined as a business's income and is not the type of calculation which would be subject to significant adjustment as would, for example, net or taxable income.

77.     Following the issuance of the MW Report, Defendants have had months to publicly refute its accusations, or at least give some explanation regarding how they could justifiably report vastly different revenues figures simultaneously in the U.S. and the PRC.  To date, Defendants have failed to do so.  To the contrary, Defendants, themselves, have tacitly confirmed much of the MW Report's allegations by announcing a planned restatement of the Company's financial results (which only occurs when there are "material" errors in previously-reported results), as did Frazer Frost in connection with the announcement that the Company's financial statements for 2008, 2009 and first two quarters of 2010 could no longer be relied upon.  Defendants' silence in this regard is not only deafening -- it is also a further breach of their on-going fiduciary duties.

### C.     Zou & Qiu Fail to Make Required Transfers to RINO from Dalian RINO

78.     As alleged above, RINO was originally incorporated in Minnesota in 1984 as Applied Biosciences, Inc.  RINO became a publicly traded corporation through a reverse merger with a shell company called Applied Biometrics in July 2007.   Today, RINO operates through its subsidiary Innomind, a British Virgin Islands corporation, and a variable interest entity ("VIE") called Dalian RINO.   Dalian RINO is jointly owned by defendants Zou and Qiu – husband and wife founders.  Prior to RINO going public, Dalian RINO had been carrying out all operations.  Innomind was founded in preparation for the reverse merger.

79.     On October 3, 2007, shortly after going public, Innomind entered into a series of agreements designed to transfer all the benefits (*i.e.*, revenue streams) of owning Dalian RINO to Innomind (and via Innomind, to RINO) without actually transferring ownership.  Under the agreements, Dalian RINO (through defendants Zou and Qiu) agreed to: (1) sell substantially all of Dalian RINO's manufacturing equipment and tangible assets to Innomind; and (2) pay to

Innomind monthly all **pre-tax** income Dalian RINO generated.

80.     Per these agreements, Dalian RINO is contractually obligated to pay to Innomind (and through Innomind to RINO) all pre-tax income generated from operations.  As discussed above, in relation to fabricated customers and fictitious U.S. reported revenues, only Dalian RINO reported any revenues to SAIC.  None of the other entities, including Innomind, reported any revenues, despite owning a contractual right to all revenues generated by Dalian RINO.

81.     Despite these agreements, as of November 2010, Dalian RINO was still conducting all of RINO's operations and is not making these required monthly payments. Strictly speaking, this failure alone to transfer revenues to Innomind (and through Innomind to RINO) is a breach of Defendants' fiduciary duties.

82.     As if the failure to honor their contracts with Innomind was not enough, Defendants have caused money to flow the opposite way - from Innomind into Dalian RINO. According to the MW Report, Dalian RINO's SAIC balance sheet shows its "Other Accounts Payable" approximate Innomind's total "Accounts Receivable".     These figures are approximately **$40 million**.

83.     The fact that Innomind currently is performing no work or services and that Dalian RINO continues to operate all lines of business is an important distinction.  There is no legitimate business reason why Innomind would have transferred money to Dalian RINO -- **especially when the contractual agreements mandate that the money flow the opposite way**. Even more egregious is that nearly all of the money transferred out of Innomind would have been raised from RINO's December 2009 equity raise.[15]  This was an illegal transfer of wealth

---

[15] As Muddy Waters notes, Innomind was originally incorporated with $20 million in paid-in-capital (according to RINO's 2009 Form 10-K), which RINO paid following its $21.3 million

from RINO (and by extension, its unfortunate public stockholders) to **Zou & Qiu, which was sanctioned by the Board**.   The Board, consistent with its other misconduct, should have intervened and prevented this illegal act from occurring.   Instead, the Board illegally favored the interests of Zou and Qiu at the direct expense of the Company and its stockholders.

### D.      Defendants Illegally "Loaned" Zou and Qiu $3.5 Million in Company Funds to Purchase a Luxury Orange County Home

84.      According to RINO's 2009 Form 10-K, on December 7, 2009, "the Company made a loan of approximately $3,500,000 to Mr. Dejun Zou and Ms. Jianping Qiu on an unsecured and interest free basis.   Mr. Zou and Mrs. Qiu are directors and officers of the Company.   There was no written loan agreement entered into by the parties regarding the foregoing."

85.      This "loan"- *made interest free and apparently without even a written contract* - was used to purchase a multi-million dollar, six bedroom, seven and three quarter bath luxury home in Orange County, California.   Additional photos shown here below:

raise in October 2007.  Virtually all of this money paid in had become receivables by December 31, 2008.  Thereafter, in late 2009, Innomind applied to increase its capital to $80 million and had contributed a total of $40 million as of November 2010.  As Innomind ended 2009 with $40.7 million in receivables, it follows that the December 2009 raise would have had to fund the receivables increase.







86.     Seemingly without any regard for propriety or their duties under Nevada law, this "loan" was extended by the Board on the very day RINO closed sales of its 3 million plus share direct offering, *i.e. the very day Defendants caused it to raise approximately $100 million from shareholders!*  Clearly, the public offering's stated purpose of **"financing for working capital"** should have included "for personal use by our CEO and Chair to buy a luxury home" as well.

87.     Section 402 of SOX expressly makes it unlawful for any issuer to make personal loans to executives (which defendants Zou and Qiu most assuredly are), and notably, the Board cannot hide behind waiver, or any other defense on this claim.  This is an *ultra vires* act, incapable of ratification through disclosure, stockholder vote, or subsequent Board approval.

88.     Thus, not only was this so-called "loan" of Company monies to Zou and Qiu expressly prohibited by law, Defendants have been forced to **admit** that this *ultra vires* act has led to potential liability for the Company:

> ***We may have inadvertently violated Section 402 of the Sarbanes-Oxley Act of 2002 and Section 13(k) of the Exchange Act and may be subject to sanctions for such violations.***
>
> ***The making of this loan and the continuation of such indebtedness thereafter until it is fully repaid create a contingent liability for a possible violation of Section 13(k) of the Exchange Act (Section 402(a) of the Sarbanes-Oxley Act of 2002). Section 13(k) provides that it is unlawful for a company, such as the Company, which has a class of securities registered under Section 12 of the Exchange Act, to directly or indirectly, including through any subsidiary, extend or maintain credit in the form of a personal loan to or for any director or executive officer of the company. Issuers violating Section 13(k) of the Exchange Act may be subject to civil sanctions, including injunctive remedies and monetary penalties, as well as criminal sanctions. The imposition of any of such sanctions on the Company may have a material adverse effect on our financial position, results of operations or cash flows.***[16]

89.     Per RINO's 2009 10-K, defendants Zou and Qiu had repaid $300,000 of the loan and had agreed to repay the balance on or before May 10, 2010.  Thereafter, RINO's August 27, 2010 Proxy Statement details Defendants' latest attempt to "clean up" this illegal purported "loan":

> On March 31, 2010, the Company entered into a loan agreement with Mr. Dejun Zou and Ms. Jianping Qiu evidencing the terms of a loan made to them in a principal sum of $3.5 million at an annual interest rate of 5.25%. Pursuant to the loan agreement evidencing such loan, Mr. Zou and Ms. Qiu also issued a secured promissory note to the Company due on May 10, 2010. Mr. Zou and Ms. Qiu are directors and officers of the Company. The loan, with principal and accrued interest totaling approximately $3.577 million, was fully repaid on May 10, 2010.

90.     Thus, at some point between December 9, 2009 (when the "loan" was originally made but remained a secret), March 31, 2010 (when RINO's auditors forced Defendants to disclose the loan via its Annual Report) and August 27, 2010 (the date of RINO's 2010 Proxy Statement), the loan's terms miraculously changed from: (i) interest free to 5.25% annual interest; (ii) a loan without written documentation to one with a written agreement; and (iii) an

---

[16] 2009 Form 10-K at p. 19.

34

unsecured loan to one secured by the luxury home.

91.     Regardless of the inconsistencies in Defendants' story once the illegal, secret "loan" came to light, and even if Defendants' belated "changes" to the loan's terms were true, the fact remains that Defendants' approval of the loan was **illegal** under SOX, an *ultra vires* act, and has subjected the Company to potential liability.

### Defendants' False and Misleading Statements

92.     Throughout the Relevant Period, Defendants issued numerous public statements that would, in light of the MW Report, be revealed as materially false and misleading statements, if not outright fabrications.

93.     On February 17, 2009, Defendants caused the Company to issue a press release reporting its expected fourth quarter and year-end 2008 earnings results.   Additionally, Defendants announced the Company's fiscal year 2009 guidance, indicating projected revenues would exceed $176 million in 2009.  Defendant Zou stated in part:

> "We are extremely pleased with our results for 2008 and our ability to surpass previously issued guidance for the fourth quarter. In addition, we expect robust revenue growth to continue during 2009 supported by increased mandates, tax incentives and funding from the Chinese government to reduce sulphur emissions and improve energy efficiency and utilization for the iron and steel industry . . . . As key components of our product mix, we expect 2009 revenues for waste water treatment, desulphurization and anti-oxidation revenues to grow by approximately 50%, 10% and 300%, respectively, compared with 2008 while maintaining a similar margin profile. Recent moves from the Chinese government, including monetary policy changes and the stimulus plan have provided the opportunity for better access to capital from local Chinese banks to support our growth objectives. . . . Improved working capital and our strong brand reputation, coupled with stringent enforcement of government regulations and aggressive tax credits and funding for environment services, are the key essentials to drive incremental growth for RINO in 2009."

94.     On May 15, 2009, Defendants caused the Company to issue a press release reporting its first quarter 2009 earnings results.  Defendants reported net income of $12.5 million, or $0.50 diluted earnings per share ("EPS"), and revenue of $35.6 million for the quarter ending March 31, 2009.

35

95.    On August 10, 2009, Defendants caused the Company to issue a press release reporting its second quarter 2009 earnings results.  Defendants reported net income of $9.9 million, or $0.39 diluted EPS, and revenue of $40.7 million for the quarter ending June 30, 2009.

96.    On November 13, 2009, Defendants caused the Company to issue a press release reporting its third quarter 2009 earnings results.  Defendants reported net income of $19.7 million, or $0.78 diluted EPS, and revenue of $63.3 million for the quarter ending September 30, 2009.

97.    On March 31, 2010, Defendants caused the Company to file its Form 10-K for its fourth quarter and fiscal year 2009 ("2009 Form 10-K").  Defendants reported net income of $13.5 million, or $0.53 diluted EPS, and record revenue of $53.0 million for the fourth quarter of 2009.  Defendants further reported net income of $56.4 million, or $2.26 diluted EPS, and revenue of $192.6 million for the year ended December 31, 2009.  In addition, for the first time, Defendants also disclosed that under their direction, RINO had in violation of U.S.  law— *illegally loaned to defendants Zou and Qiu approximately $3.5 million* for the purchase of a luxury home in southern California:

> *Loans to Related Party*
>
> *On December 7, 2009, the Company made a loan of approximately $3,500,000 to Mr. Dejun Zou and Ms. Jianping Qiu on an unsecured and interest free basis.* As of the date of this Report, $300,000 has been repaid. Mr. Zou and Mrs. Qiu are directors and officers of the Company. *There was no written loan agreement entered into by the parties regarding the foregoing*.
>
> *The making of this loan* and the continuation of such indebtedness thereafter until it is fully repaid *create a contingent liability for a possible violation of Section 13(k) of the Exchange Act* (Section 402(a) of the Sarbanes-Oxley Act of 2002). Section 13(k) provides that *it is unlawful for a company, such as the Company, which has a class of securities registered under Section 12 of the Exchange Act, to directly or indirectly,*

36

> **including through any subsidiary, extend or maintain credit in the form of a personal loan to or for any director or executive officer of the company.**
>
> **Issuers violating Section 13(k) of the Exchange Act may be subject to civil sanctions, including injunctive remedies and monetary penalties, as well as criminal sanctions. The imposition of any of such sanctions on the Company may have a material adverse effect on our financial position, results of operations or cash flows.**

Mr. Zou and Ms. Qiu have agreed to repay the loan on or before May 10, 2010.

98.     In the 2009 Form 10-K, Defendants also emphasized the predictability of RINO's earnings:

> Accordingly, environmental protection and remediation is a relatively new industry in the PRC. Nonetheless, like the Chinese economy, it is rapidly growing – we estimate that in the next 5 years, there is a wastewater remediation market of $260 million per year and the desulphurization market will grow at approximately 5% annually. Further, the market for the Company's products is highly regulated by the central PRC government, which sets specific pollution output targets for industrial enterprises. For this reason, we believe that the demand for our products is predictable, and will follow the growth of the PRC's iron and steel industry and government-mandated pollution control standards that are being made more stringent annually. We also believe that our revenue and profitability growth to date arises from these same factors. Our revenues increased by 38.3% to $192.6 million in fiscal year 2009 and by 119.8% to $139.3 million for fiscal year 2008 from $63.4 million in fiscal year 2007. Our gross profit increased by 33.1 % to $72.3 million in fiscal year 2009, compared to an increase of 78.3% to $54.3 million in fiscal year 2008 and the gross profit of $30.5 million for fiscal year 2007. Our income from operations increased by 142.9% to $55.3 million in fiscal year 2009 and by 44.0% to $22.8 million in fiscal year 2008 from $15.8 million. Our after-tax net income increased by 165.0% to $56.4 million and 108.3% to $21.3 million in fiscal years 2009 and 2008, respectively, compared to that of $10.2 million in fiscal year 2007.

99.     RINO's 2009 Form 10-K also provided the following assertions from Defendants regarding RINO's customers and revenues for its FGD systems:

> Today, there are around 200 coal-fired sinters in China without flue gas desulphurization equipment (this number is expected to rise along with the expansion of China's iron and steel industry). Prior to June 2008, government policy only capped total gas emissions in a geographic area and there was no restriction on the gas emissions of any individual coal-fired sinter. Accordingly, some coal-fired sinters only had desulphurization equipment that partially treated their gas emissions and some had no desulphurization equipment installed so long as the emission cap in the area was not exceeded. After June 2008, the government tightened gas emission control and is now requiring all coal-fired sinters to have desulphurization equipment installed. This translates into a cumulative market for our desulphurization technology of more than $1 billion in the next few years based on our estimate. We plan to penetrate this market aggressively by marketing the

Desulphurization System as a turn-key solution for the Chinese iron & steel industry's sulphur dioxide emission problems.

Our desulphurization system has been installed in steel mills such as Jinan Iron and Steel Co., Panzhihua Iron & Steel, Shengfeng Iron & Steel, Handan Iron & Steel, Chongqing Iron & Steel. And Kunming Iron & Steel, Hulingnianyuan Iron and Steel, Nanchangchangli Iron & Steel, Qianjing Iron & Steel ,Yuhua Iron & Steel, Zhuhai Yueyufeng Iron & Steel, Hefei Iron &Steel, Jiangsu Xigang Iron & Steel, Zhangdian Iron & Steel and Hunan Lianyuan Iron & Steel. For fiscal years 2008 and 2009, revenues generated from our desulphurization business was $105.3 million and $116.4 million, respectively, representing 75.6% and 60.4% of our total revenues for fiscal years 2008 and 2009, respectively.

100.    RINO's 2009 Form 10-K also provided the following assertions from Defendants regarding purported U.S. expansion efforts and final terms of the December 2009 offering:

Effective June 23, 2009, the Company complied with the requirements of California law and is now qualified and authorized to transact business in the State of California. The purpose of the California office is to provide improved communications and administrative support for Dalian RINO, as well as research and development of U.S. business opportunities as they arise. The development of the California office provides the Company with a vehicle to survey the U.S. markets for corporate growth and technology acquisition opportunities.[17]

* * *

On December 7, 2009, the Company closed sales of 3,252,032 shares of its common stock, Series A Warrants to purchase 1,138,211 common stock and Series B Warrants to purchase 1,138,211 shares of common stock with the gross proceeds of $99,999,984 (the "2009 Registered Direct Offering"). The Company plans to use the proceeds from this financing for working capital as more fully described in the financing documents.

101.    RINO's 2009 Form 10-K also contained *admissions* by Defendants regarding ineffective internal controls: "Our internal controls over financial reporting was ineffective as of December 31, 2009, and management's report was not subject to attestation by the Company's independent auditor as to their effectiveness for the fiscal year ended December 31, 2009, which

---

[17] RINO's 2009 10-K also disclosed that, as of July 31, 2009, the Company leased a branch office in Rancho Santa Margarita, California. The lease term from August 1, 2009 to July 31, 2010 with monthly rent amounted to $1,695.00.

could have a significant and adverse effect on our business."  Not only did Defendants fail to implement and maintain effective internal controls for fiscal 2009, as the Board would elucidate, it lacked "familiarity" with U.S. securities laws and could not guarantee that any remedial changes would be effective.  Critically, and to the extent that the Board was somehow unaware that RINO lacked the most-basic, effective, internal controls, this disclosure should have been a glaring  "red flag," for the Board, which affirmatively  was placed on notice of the Company's serious internal control deficiencies.

102.    RINO's 2009 Form 10-K also made clear to RINO stockholders what is patently obvious in light of Defendants' misconduct -- that Defendants (and especially the Board) have considered themselves to be beyond the reach of the U.S. judicial system:

> Because our principal assets are located outside of the United States and some of our directors and all our officers reside outside of the United States, it may be difficult for you to use the United States Federal securities laws to enforce your rights against us and our officers and some directors in the United States or to enforce judgments of United States courts against us or them in the PRC.

> All of our present officers and some of our directors reside outside of the United States. In addition, our operating subsidiary, Dalian Innomind and controlled affiliate Dalian Rino and its subsidiaries, are located in the PRC and substantially all of their assets are located outside of the United States. ***It may therefore be difficult for investors in the United States to enforce their legal rights based on the civil liability provisions of the United States Federal securities laws against us in the courts of either the United States or the PRC and, even if civil judgments are obtained in courts of the United States, to enforce such judgments in PRC courts. Further, it is unclear if extradition treaties now in effect between the United States and the PRC would permit effective enforcement against us or our officers and directors of criminal penalties, under the United States Federal securities laws or otherwise.***

103.    Thus, based on this disclosure, no reasonable RINO stockholder would have reasonably believed that the Board would have properly and impartially responded to a pre-suit demand under Nevada law in good faith.  Indeed, the members of the Board have in essence told RINO stockholders that they do not believe a judgment of a court located in the U.S. would

be enforceable against the Company's officers and directors – accordingly, why would a reasonable RINO stockholder reasonably believe that the Board would properly consider a demand under Nevada law to initiate and prosecute claims on the Company's behalf against Defendants?

104.    The 2009 Form 10-K was signed by defendants Zou, Qiu, Zhang, Quan, and Johnson.    The 2009 Form 10-K also contained SOX-required certifications ("SOX Certifications") as follows made by defendants Zou and Liu:

I, Zou/Liu, certify that:

1. I have reviewed this report on Form 10-K of RINO International Corporation (the "registrant") for the fiscal year ended December 31, 2008;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

105.    On May 17, 2010, Defendants caused the Company to issue a press release reporting its first quarter 2010 financial results.  Defendants reported net income of $8.5 million, or $0.30 diluted EPS, and revenue of $47.9 million for the quarter ended March 31, 2010.

106.    On August 16, 2010, Defendants caused the Company to issue a press release reporting its second quarter 2010 financial results.  Defendants reported net income of $15.5 million, or $0.54 diluted EPS, and revenue of $65.4 million for the quarter ended June 30, 2010. The press release stated in part:

"We are pleased to announce strong results for the second quarter 2010."  Said Mr. Dejun Zou, director and chief executive officer of RINO.  "The robust year-over-year revenue increase was primarily driven by steady growth in our two main business segments, core flue gas desulphurization and waste water treatment systems.  Going forward, the primary object for our core business segments is to continue expanding our market share and enhance gross margin.  At the same time, we will build out other business segments that are synergistic extensions of our core competence.  Municipal sludge treatment, for instance, is an area of our near-term focus."

China's clean technology industry is growing rapidly with government support. Policies and guidelines that call for increasingly stricter standards for industrial waste treatment continuously drive up demand for a greater scope of treatments as well as volume. RINO's future success depends on our ability to continue enhancing our production capacity and technological capability to keep up with industry developments. We are confident that with our focused efforts on these fronts and effective execution we will

continue to be a leading player in the industry of our fundamental business segments and successfully expand into high growth segments in the future," Mr. Zou concluded.

Mr. Ben Wang, chief financial officer of RINO,[18] added, "Both top and bottom line results were very strong in the second quarter and we are on track to achieve our targets for fiscal year 2010. For the rest of the year we will continue to enhance operational systems while investing for sustainable growth in the long term. We are also progressing according to our schedule to further strengthen our internal control and to continue to comply with Sarbanes Oxley requirements."

107.    On November 9, 2010, RINO's stock closed at $15.52 per share.

### The Truth Begins to Emerge

108.    As discussed above, on November 10, 2010, Muddy Waters published the shocking MW Report regarding RINO's business and accounting practices, claiming that the Company had been engaged in illicit and improper activities ranging from vastly inflating revenue to fabricating customer relationships, to allowing its management (Zou and Qiu) to "borrow" corporate assets to buy themselves a multi-million dollar luxury home in California.

109.    On this news, RINO's stock fell by $2.34 per share to close at $13.18 per share on November 11, 2010, a one-day decline of *15%*.

110.    On November 15, 2010, *following the issuance of the MW Report*, but before the market opened, Defendants announced extremely disappointing third quarter 2010 results with revenues of $52.7 million and net income of $8.8 million, just over half the net income reported on the prior year.  Defendants also reduced the Company's revenue forecast for 2010 from $221-$229 million to $203-$211 million.    Plaintiffs respectfully submit that the disappointing results and lower guidance stemmed from the revelations from the MW Report.

---

[18] Mr. Wang is the third CFO of RINO over the past three years.  In RINO's 2009 10-K, filed March 31, 2010, Defendants announced the appointment of Yu Li as CFO.  Yu Li had previously served as RINO's Chief Accounting Officer.  While this action is a derivative action, it has long been a tenet of federal securities case law that high turnover in senior accounting positions, particularly that of CFO, can be *indicia* of fraudulent behavior.

42

On this news, RINO's stock further declined to $7.55 per share.

111.   On November 19, 2010, Defendants caused the Company to file with the SEC a Form 8-K disclosing that RINO had received a letter from Frazer Frost which stated that RINO's CEO, defendant Zou, had informed Frazer Frost that "as to the six RINO customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable."

112.   Specifically, Defendants stated, in relevant part, that:

On November 17, 2010 Frazer Frost, LLP, the independent auditors of RINO International Corporation (the "Registrant"), delivered a letter (the "Auditor's Letter") to the Registrant and each of its directors. The Auditor's Letter states in part:

*"In a telephone conversation on November 16, 2010, Mr. Zou Dejun the Chief Executive Officer of the Company, informed Ms. Susan Woo of our firm, in substance, that as to the six RINO customer contracts discussed in the recent report of Muddy Waters LLC, the Company did not in fact enter into two of the six purported contracts, and a third contract among the six was explainable.* When Ms. Woo inquired about the Company's other contracts, Mr. Zou said he was not sure, but there might be problems with 20 - 40% of them. Assuming that these statements were reasonably accurate, it appears that our reports would have been affected if this information had been known to us at the date of our reports, although the effect on the financial statements is currently unknown and cannot be quantified without a thorough investigation. We further note that in a conversation the following day, November 17, 2010, involving Ms. Woo, several directors of the Company, Company counsel, and Mr. Zou, Mr. Zou stated that he was not sure the day before and went back to look into some things, and found that apart from the two problematic contracts, all other contracts are legitimate and can be verified.

The auditing standards of the Public Company Accounting Oversight Board provide procedures to be followed by an auditor to prevent continued reliance on audit reports in such circumstances. In view of the information provided by Mr. Zou Dejun, *we hereby advise the Company to promptly notify any person or entity that is known to be relying upon or is likely to rely upon our audit report(s) for the periods ended December 31, 2008 and December 31, 2009 and reviewed quarterly financial statements for periods between March 31, 2008 to September 30, 2010 should no longer be relied upon*, and that revised financial statements and revised auditor's report(s) will be issued upon completion of an investigation."

On November 17, 2010 certain members of the Board of Directors, including Kennith Johnson, the Chairman of the Audit Committee, Jianping Qiu, the Chairman of the Board of Directors, and Mr. Zou Dejun participated in a conference call with Ms. Susan Woo, a partner of Frazer Frost, LLP in which the foregoing statements were discussed. The two other members of the Board were not available because they were traveling and

therefore the Board of Directors could not take any formal action regarding the matters discussed in the Auditor's Letter. The Registrant intends to have a telephonic meeting of the Board of Directors to further discuss such matters and related matters as soon as all of the members of the Board of Directors are available.

113.    Also on November 19, 2010, Defendants caused the Company to file with the SEC a second Form 8-K, which in relevant part stated:

On November 18, 2010, the Board of Directors (the "Board") of RINO International Corporation (the "Registrant") a Nevada corporation, concluded that *previously issued audited financial statements of the Registrant for its fiscal years ended December 31, 2008 and 2009, which were included in the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2008 and 2009, and previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2009 should no longer be relied on*.   The Board also concluded that previously issued interim unaudited financial statements which were included in the Registrant's Quarterly Reports on Form 10-Q for the periods March 31, 2010, June 30, 2010 and September 30, 2010 should no longer be relied on inasmuch as such financial statements incorporate results from 2008 and 2009.

The conclusion of the Board that the financial statements for the above-described periods should not be relied upon was based on statements made by the Registrant's Chief Executive Officer, Mr. Zou Dejun, after consultation with the Registrant's Chief Accountant, who reported to the Board that the Registrant did not enter into two contracts for which it reported revenue during the Registrant's 2008 and 2009 fiscal years.

Three of the Registrant's Board members, including the Chairman of its Audit Committee and Chief Executive Officer, discussed the foregoing matters with the Registrant's independent accountant on November 16 and 17, 2010.

The Registrant's Board has authorized its Audit Committee to take all steps necessary to investigate the matters set forth above and other allegations of misstatements, and address any deficiencies found, including authorization to engage an outside law firm to conduct an independent investigation with the assistance of such other professionals as it may require.

114.    On December 2, 2010, Defendants issued a press release entitled "RINO International Corporation Common Stock to be Delisted by NASDAQ Stock Market."   The press release stated:

RINO International Corporation (the "Company") (Nasdaq: RINO) announced today that it has received a letter from The NASDAQ Stock Market ("NASDAQ") stating that based upon its review of the Company and pursuant to NASDAQ Listing Rules 5101, 5250(a)(1) and 5250(c)(1), the staff of NASDAQ believes that the continued listing of the Company's securities on NASDAQ is no longer warranted (the "NASDAQ Letter"). NASDAQ stated that its staff's determination was based upon the following:

1.     The Company's announcement that its previously filed financial reports for fiscal 2008, 2009 and year-to-date 2010 could no longer be relied upon;

2.     The Company's admission that it had not entered into certain previously disclosed contracts; and

3.     The Company's failure to respond to the NASDAQ staff's request for additional information regarding allegations raised by the Muddy Waters, LLC report.

The NASDAQ Letter stated that the statement by the Company's independent auditors that their audit reports for 2008 and 2009 can no longer be relied upon constitutes a violation by the Company of NASDAQ Listing Rule 5250(c)(1). The letter also states that the Company's failure to respond to a letter from the NASDAQ staff dated November 17, 2010 constitutes a violation of NASDAQ Listing Rule 5250(a).

The NASDAQ Letter further notified the Company that unless the Company requests an appeal of the NASDAQ staff's determination, trading of the Company's common stock will be suspended at the opening of business on December 8, 2010 and a Form 25-NSE will be filed by NASDAQ with the SEC, which will remove the Company's securities from listing and registration on NASDAQ.

The Company does not intend to appeal the NASDAQ staff's determination to delist the Company's common stock. Pending the delisting of the Company's common stock, which is expected to occur on December 8, 2010, the suspension of trading in the Company's common stock, which commenced on November 17, 2010, remains in effect.

The Company currently intends to re-apply for a listing of its common stock on NASDAQ at an appropriate time after the completion of an independent investigation to be conducted by the Audit Committee of the Company's Board of Directors of the allegations contained in a research report issued by Muddy Waters, LLC, the filing of restated financial statements of the Company for its fiscal years ended December 31, 2008 and 2009 and for the quarterly periods included in the Company's Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 to September 30, 2010 and the Company's satisfaction of all other listing criteria.

115.     Also on December 2, 2010, the Company filed a Form 8-K, which, in addition to repeating the information contained in the above press release, disclosed that the Company was now subject to a formal SEC investigation:[19]

The Company has been notified by the Staff of the Securities and Exchange Commission (the "SEC") that it is conducting a formal investigation relating to the Company's financial reporting and compliance with the Foreign Corrupt Practices Act for the period January 1, 2008 through the present. The Company is cooperating with the SEC's investigation. It is not possible to predict the outcome of the investigation, including whether or when any proceedings might be initiated, when these matters may be resolved or what if any penalties or other remedies may be imposed.

---

[19] Upon information and belief, the formal SEC investigation remains ongoing.

116.   Defendants' public statements during the Relevant Period were materially false and misleading because, among other things:

    a.   RINO's financial results reported to the SEC and its shareholders were inconsistent with its financial results reported to the PRC government;

    b.   RINO's reported financial statements were grossly and artificially inflated by including revenues it had not earned;

    c.   RINO's public filings contained outright fabrications concerning fictitious, non-existent customers;

    d.   RINO's affiliated entities were in breach of contractual obligations to transfer assets and revenue to RINO; and

    e.   Defendants, in breach of their fiduciary obligations and in violation of SOX , had secretly "loaned" Company money, interest free, to defendants Zou and Qiu for the purchase of a luxury southern California home.

117.   As a result of Defendants' materially false statements and omissions, RINO's common stock traded at artificially inflated prices during the Relevant Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales.

118.   As a result of the above, RINO's stock price has fallen off a cliff, declining from a closing price of $15.52 on November 9, 2010 (the day before the MW Report was released) to a closing price of $3.15 per share on December 8, 2010 (the day they resumed trading).  Cumulatively, RINO's shares declined $12.97 per share, or almost *80%* during this time.  The price of the Company's stock still has not recovered and currently trades for less than $2 per share.

119.    Notably, the allegations herein stemmed from a single report prepared by an outsider with no access to Defendants, or the Company's internal documents.  One can only imagine what full-blown discovery would show; this is precisely the type of case that should not be dismissed on a pleading motion.  The Company has certainly been damaged by Defendants' breaches of fiduciary duty and other misconduct, but the full extent and breadth of that damage will only be finally known through discovery.

### DERIVATIVE AND DEMAND ALLEGATIONS

120.    Plaintiffs bring this action derivatively in the right and for the benefit of RINO to redress the breaches of fiduciary duty and other violations of law by Defendants.

121.    Plaintiffs will adequately and fairly represent the interests of RINO and its shareholders in enforcing and prosecuting its rights, and they have retained counsel experienced in litigating this type of action

122.    At the time this action was initiated, defendants Zou, Qiu, Johnson, Quan and Li comprised the Board (the "Demand Directors").  Plaintiffs have not issued a demand on the Demand Directors to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

123.    Illegal acts are not afforded protection under the business judgment rule.  The facts alleged herein show that the Board's secret $3.5 million interest-free "loan" of Company funds to defendants Zou and Qiu is just such an illegal, *ultra vires* act.  Since defendants publicly disclosed the "loan," the Board has been forced to admit the illegality of their actions and the liabilities those actions have exposed the Company to.  In particular, the Board has been forced to admit that as a result of the "loan," the Company was in violation of Section 402(a) of SOX.  Notwithstanding the attempted belated ratification of this illicit "loan" by Defendants,

this act is void and incapable of being cured.  Based thereupon, Plaintiffs need not issue any demand upon the Demand Directors, all of whom served on the Board at the time the loan was made. Thus, demand is excused.

124.   Since the time it was revealed publicly, the Demand Directors have issued contradictory disclosures regarding the terms and circumstances of the purported "loan" of $3.5 million in Company funds to Zou and Qiu.  Indeed, it has become clear that over time, the purported terms and circumstances of the purported "loan" have become more and more "palatable" due to the Demand Directors' ever-changing story.  As detailed herein, over an eight month period, from December 9, 2009 (when the "loan" was originally made to Zou and Qiu but kept a secret), to March 31, 2010 (when RINO's auditors forced Defendants to disclose the loan to shareholders for the first time via its Annual Report) and then to August 27, 2010 (the date of RINO's 2010 Proxy Statement), per the Demand Directors' continually changing disclosures, the loan's terms miraculously transformed from: (i) interest free to 5.25% annual interest; (ii) a loan without written documentation to one with a written agreement; and (iii) an unsecured loan to one secured by the luxury home.  Based on these contradictory disclosures in which the Demand Directors apparently took some time to get their story straight, no reasonable RINO stockholder would reasonably believe that the Board could have properly and impartially responded to a demand in good faith.

125.   Although the Demand Directors have issued a series of unclear and contradictory disclosures in an attempt to sanitize the so-called "loan" to Zou and Qiu, they have issued crystal-clear disclosures in one respect.  Indeed, per the Company's 2009 Form 10-K, they have expressly admitted to RINO stockholders what is patently obvious in light of Defendants' misconduct -- that although RINO is incorporated in Nevada, they strongly consider themselves

48

and other top RINO insiders to be beyond the reach of the U.S. judicial system.  Accordingly, no reasonable RINO stockholder would reasonably believe that the Demand Directors could have properly and impartially responded to a pre-suit demand under Nevada law in good faith. Indeed, the members of the Board have in essence told RINO stockholders that they do not believe a judgment of a court located in the U.S. would be enforceable against the Company's officers and directors – thus, no reasonable RINO stockholder would reasonably believe that the Demand Directors would properly consider a demand under Nevada law to initiate and prosecute claims on the Company's behalf against Defendants.

126.     Based on the above three paragraphs, even though Plaintiffs need not satisfy a traditional demand futility analysis regarding the Demand Directors, such an analysis also supports Plaintiffs' right to elect forgoing issuing a demand prior to filing suit, as all five Demand Directors either: (a) engaged in conduct not protected by the business judgment rule; (b) would be interested in a demand; (c) or lack independence from a demonstrably interested director:

   a.   Defendants Zou and Qui are directly interested in a demand because they caused the Company to extend to them a $3.5 million "unsecured and interest free" loan so that they could purchase a luxury home in Orange County, California.    Thus, defendants Zou and Qiu stand on both sides of the transaction, and received a $3.5 million (interest free) benefit not shared with RINO shareholders as a result of the transaction.  Thus, demand on Zou and Qui is excused.

   b.   Defendants Johnson, Quan and Li have admitted that their actions in extending the secret $3.5 million loan of Company funds to defendants Zou

and Qiu were illegal and improper, and that these actions have potentially exposed the Company to liability.  There is no business judgment protection for admittedly illegal acts.  Accordingly, defendants Johnson, Quan, and Li face a substantial likelihood of liability for their breaches of fiduciary duties in connection with the admittedly illegal loan of Company monies to Zou and Qiu.  Because Johnson, Quan and Li comprise a majority of the Demand Directors (notwithstanding defendants Zou and Qiu to whom the "loan" was made), demand is excused;

c.  Every member of the Board was aware of, or should have been aware of, numerous red flags regarding the Company's pervasive internal control failures.  Specifically, as discussed above, Defendants have previously admitted that the Company failed to adequately maintain internal controls in the 2009 Form 10-K.  Despite clearly being placed on notice of illicit practices, Defendants consciously disregarded their fiduciary duties to RINO when, under their direction, the Company continued to maintain wholly ineffective internal controls, which resulted in the pervasive, impermissible conduct described herein.  Accordingly, demand is excused;

d.  During the Relevant Period, defendants Johnson, Quan, and Li served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the adequacy of the Company's internal controls and reviewing the Company's financial statements.  Defendants Johnson, Quan, and Li breached their fiduciary duties of due care, loyalty,

and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures and failed to ensure that adequate internal controls were in place.  Specifically, defendants Johnson, Quan, and Li allowed two sets of materially different financial statements to be published in two different legal jurisdictions.  The revenues for fiscal year 2009 differ by more than $180 million.  Therefore, defendants Johnson, Quan, and Li each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

e.   Due to their close familial relationships with each other, defendants Zou and Qiu are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action against each other.   In particular, defendants Zou and Qiu are married to each other.   Thus, defendants Zou and Qiu lack independence;

f.   The entire Board has clearly demonstrated its unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein.   As alleged above, although Defendants have been forced to admit that they may have "inadvertently" violated the law in connection with the ***$3.5 million*** interest free loan to Zou and Qiu, the Board has failed to disclose, among other things: (a) how the Company ended up issuing the loan; (b) which individuals were responsible for the loan; or (c) what role (if any) the Board played with respect to the

loan.  Other than the grossest generalities, the findings of the Board have been carefully hidden from RINO stockholders and in such circumstances, Nevada law does not require a stockholder to make a pre-suit demand on a board of directors.  Thus, demand is excused;

g.   The principal professional occupation of defendant Zou is his employment with RINO as its co-founder and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, in the Company's Proxy Statement filed on August 27, 2010, Defendants admitted that defendant Zou is not an independent director. Thus, defendant Zou lacks independence from interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action; and

h.   The principal professional occupation of defendant Qiu is her employment with RINO as its co-founder and Chairman of the Board, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits.  In addition, in the Company's Proxy Statement filed on August 27, 2010, Defendants admitted that defendant Qiu is not an independent director.   Thus, defendant Qiu lacks independence from interested directors, rendering her incapable of impartially considering a demand to commence and vigorously prosecute this action.

## <u>COUNT I</u>

**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

127.   Plaintiffs incorporate by reference and reallege each and every allegation set

forth above, as though fully set forth herein.

128.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that RINO disseminated accurate, truthful and complete information to its shareholders.

129.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to RINO shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

130.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

131.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

132.    As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

133.    Defendants willfully ignored the obvious and pervasive problems with RINO's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

134.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III

**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY**

135.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

136.    Defendants owed and owe RINO fiduciary obligations.   By reason of their fiduciary relationships, Defendants specifically owed and owe RINO the highest obligation of good faith, fair dealing, loyalty and due care.

137.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision and admitted as such in RINO's 2009 Form 10-K.

138.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, RINO has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

139.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

140.    Plaintiffs, on behalf of RINO, have no adequate remedy at law.

## COUNT IV

**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

141.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

142.    By their wrongful acts and omissions, the Defendants were unjustly enriched at

the expense of and to the detriment of RINO.

143.    Plaintiffs, as a shareholder and representative of RINO, seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT V

## AGAINST DEFENDANTS ZOU AND QIU FOR UNJUST ENRICHMENT

144.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

145.    Defendants Zou and Qiu obtained a *$3.5 million* interest free loan from the Company for the purchase of their own personal house.  Critically, this benefit is not shared with shareholders.

146.    Plaintiffs, as shareholders and representatives of RINO, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging these defendants of the *$3.5 million* loan.

## COUNT VI

## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

147.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

148.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence RINO, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing RINO to misrepresent material facts regarding its financial position and business prospects.

149.    As a direct and proximate result of Defendants' abuse of control, RINO has

sustained significant damages.

150.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

151.    Plaintiffs, on behalf of RINO, have no adequate remedy at law.

## COUNT VII

### AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

152.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

153.    Defendants had a duty to RINO and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of RINO.

154.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of RINO in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of RINO's affairs and in the use and preservation of RINO's assets.

155.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused RINO to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to RINO, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged RINO.

## COUNT VIII

### AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

156.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

157.   As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused RINO to incur (and RINO may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' misconduct and unlawful actions.  As a result of this waste of corporate assets, Defendants are liable to the Company.

158.   Plaintiffs, on behalf of RINO, have no adequate remedy at law.

## COUNT IX

### AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS IN CONNECTION WITH THE $3.5 MILLION LOAN TO ZOU AND QIU

159.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

160.   Because the Board gave defendants Zou and Qiu a $3.5 million interest free loan, Defendants have caused RINO to expend funds, which have not been shared with the Company's other shareholders and which the Company has received *no* consideration for.  As a result of this waste of corporate assets, Defendants are liable to the Company.

161.   Plaintiffs, on behalf of RINO, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

57

B.      Directing RINO to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to RINO restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: March 4, 2010

**ALDRICH LAW FIRM, LTD.**


_s/ John P. Aldrich_____
John P. Aldrich, Esq.
Nevada Bar No. 6877
1601 S. Rainbow Blvd, Ste 160
Las Vegas, Nevada  89146
(702) 853-5490
(702) 227-1975 (fax)

_Local Counsel for Plaintiffs_

**THE SHUMAN LAW FIRM**
Kip B. Shuman
Rusty E. Glenn
885 Arapahoe Avenue
Boulder, CO  80302
(303) 861-3003
(303) 484-4886 (fax)

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Phone: (610) 225-2677
Fax: (610) 225-2678

**THE WEISER LAW FIRM, P.C.**
Kathleen A. Herkenhoff
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Phone: (858) 794-1441
Fax: (858) 794-1450

*Lead Counsel for Plaintiffs*

## RINO International, Inc. Verification

I, Robert Binneweis, hereby verify that I am familiar with the allegations in the Verified

Consolidated Shareholder Derivative Complaint and that I have authorized the filing of the

Complaint, and that the foregoing is true and correct to the best of my knowledge, information

and belief.

Date: _____4/3/11_____

Robert Binneweis

## <u>RINO INTERNATIONAL CORP. ATTORNEY VERIFICATION</u>

I, Brett D. Stecker, hereby verify I am a member of The Weiser Law Firm, P.C., Co-Lead Counsel for plaintiffs in this action and counsel for plaintiff Andy Nguyen ("Nguyen"). I have read the foregoing Verified Consolidated Shareholder Derivative Complaint and, to the best of my knowledge, information and belief, the allegations set forth therein are true and correct. This verification is made by plaintiff Nguyen's counsel rather than Nguyen personally because Nguyen has been out of the country (in Vietnam) since mid-February. As soon as practicable, Plaintiffs shall substitute a signed verification from plaintiff Nguyen for this attorney verification

Date: March 4, 2011

_____
Brett D. Stecker